**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STACI JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSUNION, LLC<br><br>Defendant. | Case No. 1:25-cv-11188<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Staci Johnson ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against TransUnion, LLC ("TransUnion," or "Defendant") and alleges as follows, based on personal knowledge as to her own acts and on investigation conducted by counsel as to all other allegations:

## I. INTRODUCTION

1. Data breaches are preventable and occur due to the lack of attention and resources that companies like Defendant expend on protecting the highly sensitive information they are entrusted with.

2. Plaintiff brings this class action against Defendant for its failure to properly secure Plaintiff's and Class Members' personally identifiable information ("PII") in connection with a data security event disclosed by Defendant in August 2025 (the "Data Breach").

3. The PII breached appears to have included names, Social Security numbers, billing addresses, phone numbers, email addresses, and dates of birth.[1]

[1] Bill Toulas, *TransUnion suffers data breach impacting over 4.4 million people*, Bleeping Computer (Aug. 28, 2025), available at https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/.

4. Defendant failed to comply with industry standards to protect information systems that contain PII. Plaintiff seeks, among other things, orders requiring Defendant to fully and accurately disclose the nature of the information that has been compromised and to adopt sufficient security practices and safeguards to prevent incidents like the Data Breach in the future.

5. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' PII with which it was entrusted to protect.

6. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure PII from those risks left that property in a dangerous condition.

7. Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security; (6) failing to encrypt or adequately encrypt the PII; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, (9) failing to adequately vet and continuously monitor its third-party vendors for compliance with cybersecurity best practices; (10) failing to implement and execute an adequate comprehensive vender risk management (VRM)

program; and (11) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

8. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' PII and failing to take standard and reasonably available steps to prevent the Data Breach.

9. In addition, Defendant failed to properly maintain and monitor the computer network and systems that housed the PII. Had it properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the PII of Plaintiff and Class Members.

10. Plaintiff's and Class Members' identities are now at high risk because of Defendant's negligent conduct since the PII that Defendant collected and maintained is now in the hands of data thieves.

11. As a result of the Data Breach, Plaintiff and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their financial accounts and credit reports to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages.

12. The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is hard evidence that the Plaintiff's and Class Members' PII was targeted, accessed, and/or has been misused.

13. Plaintiff and Class Members must now closely monitor their financial accounts and credit reports to guard against future identity theft and fraud. Plaintiff and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

14. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their PII; and/or (f) the continued risk to their sensitive PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect what it collected and maintained.

15. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of Plaintiff and all similarly situated individuals whose PII was accessed during the Data Breach.

16. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

17. The exposure of one's PII to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiff and the Class Members' PII was exactly that—private. Not anymore. Now, their PII is forever exposed and unsecure.

## II. PARTIES

### A. Plaintiff

18. Plaintiff Johnson is a citizen and resident of Florida.

### B. Defendant TransUnion

19. Defendant TransUnion, LLC is a limited liability corporation with its principal place of business located in Chicago, Illinois. Defendant TransUnion, LLC conducts business throughout this District, and nationwide.

## III. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of Class Members is numerous, with many members of whom have different citizenship from Defendant, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21. This Court has personal jurisdiction because Defendant maintains its principal place of business in this District, regularly conduct business in this District, and has sufficient minimum contacts in this District.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is domiciled in this District and maintains Plaintiff's and Class Members' PII in this District.

## IV. FACTUAL ALLEGATIONS

### A. Overview of Defendant

23. TransUnion is a consumer credit reporting agency.

24. TransUnion uses Salesforce, Inc., a third-party application.[2]

25. Salesforce is a cloud-based software company that provides various services to corporate clients, including but not limited to TransUnion.

26. Defendant collected and stored Plaintiff's and the proposed Class Members' PII on its information technology computer systems.

27. Defendant made promises and representations to individuals, including Plaintiff and Class Members, that the PII collected from them would be kept safe and confidential, and that the privacy of that information would be maintained. For instance, Defendant's website states as follows:[3]

**Our Security**

Data security and stewardship is vital to consumer protection and enabling trust. At TransUnion, we continually invest in improvements to protect the data we hold on behalf of consumers and businesses.

To maintain a comprehensive information security program consistent to our size and complexity, we secure and protect the information entrusted to us by building, monitoring and defending security ecosystem built on a foundation of compliance and accountability. We proactively manage our programs and continuously invest to secure the data we hold on behalf of consumers and businesses.

28. Furthermore, Defendant made representations regarding the security of its third-party vendors as follows:[4]

---

[2] Toulas, *supra* n.1.

[3] TransUnion, *Data Security*, https://www.transunion.com/client-support/data-security (last visited Sept. 15, 2025).

[4] *Id.*

> **Third-Party Risk Management**
>
> Our security ecosystem includes the use of third parties, suppliers and vendors who are carefully selected to support our risk goals. Our Third-Party Risk Management program sets requirements and guidelines for third-party vendors, suppliers and partners, using an Enterprise Security Ratings Platform to gather terabytes of data from security sensors around the world, and providing insights concerning potential risks. Each third-party company receives a security rating based on the severity, frequency and duration of security incidents.

29. Large companies like Defendant have an interest in maintaining the confidentiality of the PII entrusted to them, and they are well-aware of the numerous data breaches that have occurred throughout the United States and their responsibility for safeguarding PII in their possession.

30. Defendant represented to consumers and the public that it possesses robust security features to protect PII and that it takes its responsibility to protect PII seriously.

31. Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

32. As a result of collecting and storing the PII of Plaintiff and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff and the Class Members' PII from disclosure to third parties.

**B. The Data Breach**

33. On or about July 28, 2025, an unauthorized third party gained access to Salesforce's systems.[5]

34. Attackers gained access to Salesforce's systems by first breaching the GitHub of Salesloft, a third-party sales engagement platform in March 2025. Salesloft's Drift platform is a tool that integrates with Salesforce. The breach of Salesloft's GitHub led to the theft of Drift OAuth tokens that were later used to gain access to Salesforce data.[6]

35. Defendant knew (or should have known) of the recent increase in similar data breaches, that were aimed at its vendor, Salesforce.[7] In fact, Google's Threat Intelligence Group warned that threat actors tracked as UNC6040 were targeting Salesforce customers in social engineering attacks.[8]

36. On July 26, 2025, Defendant publicly reported the Data Breach to the Office of the Maine Attorney General.[9]

37. The Data Breach compromised the following information:

- Full names
- Social Security numbers (SSNs)
- Billing addresses
- Dates of birth

---

[5] Toulas, *supra* n.1.
[6] Bill Toulas, *Salesloft: March GitHub repo breach led to Salesforce data theft attacks*, Bleeping Computer (Sept. 8, 2025), available at: https://www.bleepingcomputer.com/news/security/salesloft-march-github-repo-breach-led-to-salesforce-data-theft-attacks/.
[7] *Id*.
[8] Lawrence Abrams, *ShinyHunters behind Salesforce data theft attacks at Qantas, Allianz Lift, and LVMH*, Bleeping Computer (July 30, 2025), available at: https://www.bleepingcomputer.com/news/security/shinyhunters-behind-salesforce-data-theft-attacks-at-qantas-allianz-life-and-lvmh/.
[9] Emma Woollacott, *4.5 million people just had their data exposed in the TransUnion breach*, ITPro, available at: https://www.itpro.com/security/data-breaches/transunion-breach-what-can-customers-do (last visited Sept. 16, 2025).

- Phone numbers
- Email addresses[10]

38. Defendant failed to prevent the Data Breach because it did not adhere to commonly accepted security standards and failed to detect that its databases were subject to a security breach.

39. The PII that Defendant allowed to be exposed in the Data Breach are the types of private information that Defendant knew or should have known would be the target of cyberattacks.

40. The U.S. Federal Trade Commission ("FTC") directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[11] Immediate notification of a data breach is critical so that those impacted can take measures to protect themselves.

41. Despite learning of the Data Breach on or around July 28, 2025, Defendant did not send notice to impacted individuals until August 26, 2025.[12]

**C. Plaintiff's Experience**

42. Plaintiff Johnson's PII was held by TransUnion.

43. Defendant sent Plaintiff Johnson a letter dated August 26, 2025, informing her that her PII was compromised in the Data Breach, including her highly sensitive Social Security number and date of birth.

44. As a result of the Data Breach, Plaintiff has and will continue to spend time trying to mitigate the consequences of the Data Breach. This includes time spent verifying the legitimacy

---

[10] Toulas, *supra* n.1.

[11] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last visited Sept. 11, 2025).

[12] Adam Hardy, *Credit Bureau TransUnion Confirms Data Breach Affecting Over 4 million People*, Money (Aug. 29, 2025), https://money.com/transunion-data-breach/.

of communications related to the Data Breach, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred.

45. Plaintiff Johnson is very careful about sharing her sensitive PII and diligently maintains her PII in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

46. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has experienced stress, anxiety, and increased concerns for the loss of her PII and privacy. This time has been lost forever and cannot be recaptured. The harm caused to Plaintiff cannot be undone.

47. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

48. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of cybercriminals.

49. Future identity theft monitoring is not only reasonable and necessary but was also suggested by Defendant, and such services will include future costs and expenses. Defendant has only offered its credit monitoring services for 24 months, which is insufficient to adequately protect Plaintiff from misuse of her compromised PII.

50. Plaintiff has a continuing long-term interest in ensuring that her PII, which, upon information and belief, remains in Defendant's control, is protected, and safeguarded from future breaches.

**D. Injuries to Plaintiff and Class Members**

51. As a direct and proximate result of Defendant's actions and omissions in failing to protect Plaintiff and Class Members' PII, Plaintiff and Class Members have been injured.

52. Plaintiff and Class Members have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

53. In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by a breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[13]

54. In addition to fraudulent charges and damage to their credit, Plaintiff and Class Members may spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; and (j) paying late fees and declined payment penalties as a result of failed automatic payments.

[13] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf. (last visited Sept. 11, 2025).

55. Additionally, Plaintiff and Class Members have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value or use of their PII, and the loss of privacy.

**E. Securing PII and Preventing Breaches**

56. Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an internet-accessible environment when there was a reasonable need to do so.

57. Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

58. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

59. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

[14] 17 C.F.R. § 248.201 (2013).
[15] *Id*.

60. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

**F. The Value of PII**

61. It is well known that PII, and Social Security numbers in particular, are an invaluable commodity and a frequent target of hackers.

62. People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[16]

63. People are particularly concerned with protecting the privacy of their financial account information and Social Security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[17] There are long-term consequences to data breach victims whose Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers have been accessed, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."[18]

64. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity

---

[16] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf. (last visited Sept. 11, 2025).

[17] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.

[18] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited Sept. 11, 2025).

credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

65. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

66. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of

---

[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/. (last visited Sept. 11, 2025).

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, June 30, 2025, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/. (last visited Sept. 11, 2025).

[21] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[22] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited Sept. 11, 2025).

misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

68. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

69. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

70. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

71. The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[23] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[24] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

72. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

73. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

74. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

75. Defendant knew of the unique type and the significant volume of data contained in the PII that Defendant stored on its networks, and, thus, the significant number of individuals who would be harmed by the exposure of the data.

76. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf. (last visited Sept. 11, 2025).

**G. Industry Standards for Data Security**

77. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[26]

78. In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, Capital One, and Aflac, Defendant knew of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

79. Therefore, the increase in such attacks, and the attendant risk of future attacks, were widely known to the public and to anyone in Defendant's industry, including Defendant.

80. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Monitoring for suspicious or irregular traffic to servers;

c. Monitoring for suspicious credentials used to access servers;

d. Monitoring for suspicious or irregular activity by known users;

e. Monitoring for suspicious or unknown users;

f. Monitoring for suspicious or irregular server requests;

g. Monitoring for server requests for PII;

h. Monitoring for server requests from VPNs; and

i. Monitoring for server requests from Tor exit nodes.

---

[26] *How to Protect Your Networks from Ransomware*, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Sept. 11, 2025).

81. The FTC publishes guides for businesses for cybersecurity[27] and protection of PII[28] which includes basic security standards applicable to all types of businesses.

82. The FTC recommends that businesses:

a. Identify all connections to the computers where sensitive information is stored.

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting business.

d. Scan computers on the company's network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e. Pay particular attention to the security of the company's web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

f. Use a firewall to protect company computers from hacker attacks while they are connected to a network, especially the internet.

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

[27] Start with Security: A Guide for Business, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Sept. 11, 2025).

[28] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 11, 2025).

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

83. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[29]

84. Because Plaintiff and Class Members entrusted Defendant with PII, Defendant had a duty to keep the PII secure.

85. Plaintiff and Class Members reasonably expect that when their PII is provided to a sophisticated business for a specific purpose, that business will safeguard their PII and use it only for that purpose.

86. Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

## V. CLASS ALLEGATIONS

87. This action is brought as a class action pursuant to Federal Rule of Civil Procedure 23.

---

[29] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Sept. 11, 2025).

88. Plaintiff brings this action on behalf of herself and the following Class:

> All residents of the United States whose PII was compromised by TransUnion as a result of the Data Breach.

89. The Class excludes the following: Defendant, its affiliates, and its current and former employees, officers and directors, and the judge assigned to this case.

90. The Class definition may be modified, changed, or expanded based upon discovery and further investigation.

91. *Numerosity*: The Class is so numerous that joinder of all members is impracticable, evidenced by the large number of individuals presently known to have been injured by Defendant's conduct. The Class is ascertainable by records in the possession of Defendant or third parties.

92. *Commonality*: Questions of law or fact common to the Class include, without limitation:

a. Whether Defendant owed a duty or duties to Plaintiff and Class Members to exercise due care in collecting, storing, safeguarding, and obtaining their PII;

b. Whether Defendant breached that duty or those duties;

c. Whether Defendant failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

d. Whether the security provided by Defendant was satisfactory to protect PII as compared to industry standards;

e. Whether Defendant misrepresented or failed to provide adequate information regarding the type of security practices used;

f. Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' PII secure and prevent loss or misuse of that PII;

g. Whether Defendant acted negligently in connection with the monitoring and protecting of Plaintiff's and Class Members' PII;

h. Whether Defendant's conduct was intentional, willful, or negligent;

i. Whether Plaintiff and Class Members suffered damages as a result of Defendant's conduct, omissions, or misrepresentations; and

j. Whether Plaintiff and Class Members are entitled to injunctive, declarative, and monetary relief as a result of Defendant's conduct.

93. *Typicality*: Plaintiff's claims are typical of the claims of Class Members. Plaintiff and Class Members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

94. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff's counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

95. *Predominance and superiority*: Questions of law or fact common to Class Members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class Members is impracticable and the amount at issue for each Class Member would not justify the cost of litigating individual claims. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. There are no known difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

96. Further, Defendant's unlawful conduct applies generally to all Class Members, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VI. CAUSES OF ACTION

**COUNT I**
**NEGLIGENCE**
**(On Behalf of the Class)**

97. Plaintiff realleges and incorporates by reference herein all preceding paragraphs as if fully set forth herein.

98. Defendant owed a duty of care to Plaintiff and Class Members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems. These common law duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendant knew that it was more likely than not Plaintiff and Class Members would be harmed by such exposure of their PII.

99. Defendant's duties to use reasonable security measures also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members entrusted their PII with Defendant, Defendant accepted and held the PII, and Defendant represented that the PII would be kept secure pursuant to its data security policies. Defendant could have ensured that its data security systems and practices were sufficient to prevent or minimize the Data Breach.

100. Defendant's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits

"unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty. Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

101. Defendant breached the aforementioned duties when it failed to use security practices that would protect Plaintiff's and Class Members' PII, thus resulting in unauthorized third-party access to the Plaintiff's and Class Members' PII.

102. Defendant further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff's and Class Members' PII within its possession, custody, and control.

103. As a direct and proximate cause of failing to use appropriate security practices, Plaintiff's and Class Members' PII was disseminated and made available to unauthorized third parties.

104. Defendant admitted that Plaintiff's and Class Members' PII was wrongfully disclosed as a result of the Breach.

105. The Breach caused direct and substantial damages to Plaintiff and Class Members, as well as the possibility of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud or identity theft.

106. By engaging in the forgoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendant's conduct was negligent and departed from reasonable standards of care including by, including but not limited to: failing to

adequately protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class Members' PII.

107. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

108. Neither Plaintiff nor the Class contributed to the Breach or subsequent misuse of their PII as described in this Complaint.

109. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have been put at an increased risk of credit fraud or identity theft, and Defendant must mitigate damages by providing adequate credit and identity monitoring services.

110. Plaintiff and Class Members are entitled to damages for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of two years.

111. Plaintiff and Class Members are entitled to damages to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiff and Class Members have spent and will continue to spend as a result of Defendant's negligence.

112. Plaintiff and Class Members are entitled to damages to the extent their PII has been diminished in value because Plaintiff and Class Members no longer control their PII and to whom it is disseminated.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On Behalf of the Class)

113. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

114. Defendant invited Plaintiff and Class Members to provide their PII to Defendant. As consideration for the benefits Defendant provided, Plaintiff and Class Members provided their PII to Defendant. When Plaintiff and Class Members provided their PII to Defendant, they entered into implied contracts by which Defendant agreed to protect their PII and only use it solely to administer benefits and services. As part of the offer, Defendant would safeguard the PII using reasonable or industry-standard means.

115. Accordingly, Plaintiff and Class Members accepted Defendant's offer to administer benefits and services and provided Defendant their PII.

116. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant. However, Defendant breached the implied contracts by failing to safeguard Plaintiff's and the Class Members' PII.

117. The losses and damages Plaintiff and Class Members sustained that are described herein were the direct and proximate result of Defendant's breaches of its implied contracts with them. Additionally, because Plaintiff and Class Members continue to be parties to the ongoing administration and distribution of benefits and services under the contracts, and because damages may not provide a complete remedy for the breaches alleged herein, Plaintiff and Class Members are therefore entitled to specific performance of the contracts to ensure data security measures necessary to properly effectuate the contracts maintain the security of their PII from unlawful exposure.

118. Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract, and Plaintiff and Class Members are entitled to associated damages and specific performance.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of the Class)**

119. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

120. Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Defendant and that was ultimately compromised in the Data Breach.

121. Defendant, by way of its acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on security measures to secure Plaintiff and Class Members' PII.

122. Defendant also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

123. Instead of providing for a reasonable level of security that would have prevented the Breach—as is common practice among companies entrusted with such PII—Defendant instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff and Class Members. Nevertheless, Defendant continued to obtain the benefits conferred on them by Plaintiff and Class Members. The benefits conferred upon, received, and enjoyed by Defendant were not conferred gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

124. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result. As a result of Defendant's decision to profit rather than provide requisite security, and the resulting Breach disclosing Plaintiff and Class Members' PII, Plaintiff and Class Members

suffered and continue to suffer considerable injuries in the forms of, *inter alia*, attempted identity theft, time and expenses mitigating harms, diminished value of PII, loss of privacy, and increased risk of harm.

125. Thus, Defendant engaged in opportunistic conduct in spite of its duties to Plaintiff and Class Members, wherein it profited from interference with Plaintiff's and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its conduct.

126. Accordingly, Plaintiff and Class Members respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically, the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PII, and compensatory damages.

**COUNT IV**
**INJUNCTIVE/DECLARATORY RELIEF**
**(On Behalf of the Class)**

127. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

128. Defendant owes a duty of care to Plaintiff and Class Members requiring it to adequately secure PII.

129. Defendant still stores Plaintiff's and Class Members' PII.

130. Since the Data Breach, Defendant has announced no specific changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent similar incidents from occurring in the future.

131. Defendant has not satisfied its legal duties to Plaintiff and Class Members.

132. Actual harm has arisen in the wake of the Data Breach regarding Defendant's duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their PII, and Defendant's failure to address the security failings that led to that exposure.

133. Plaintiff, therefore, seeks a declaration: (a) that Defendant's existing security measures do not comply with its duties of care to provide adequate security; and (b) that to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a. ordering that Defendant engage third-party security auditors as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c. ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d. ordering that Defendant segment customer PII by, among other things, creating firewalls and access controls so that if one area of Defendant's system is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. ordering that Defendant purge, delete, and destroy in a reasonably secure manner PII not necessary for its provision of services;

f. ordering that Defendant conduct regular computer system scanning and security checks; ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

g. ordering Defendant to meaningfully educate its current, former, and prospective customers about the threats they face because of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

a. For an order certifying the Class, appointing Plaintiff as Class Representative, and appointing the law firms representing Plaintiff as counsel for the Class;

b. For compensatory, punitive, statutory, and treble damages in an amount to be determined at trial;

c. Payment of costs and expenses of suit herein incurred;

d. Both pre-and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and expert fees; and

f. Such other and further relief as the Court may deem proper.

## VIII. JURY DEMAND

Plaintiff hereby respectfully demands a trial by jury.

Dated: September 16, 2025

Respectfully submitted,

*<u>/s/Richard Schwartz</u>*
Richard Schwartz, ARDC# 6323474
BERGER MONTAGUE PC
110 N Wacker Drive, Suite 2500
Chicago, IL 60606
T. 773.257.0255
rschwartz@bergermontague.com

E. Michelle Drake, Bar No. 229202
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bergermontague.com

Mark B. DeSanto (*admission* forthcoming)

BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215.875.3000
F. 215.875.4604
mdesanto@bergermontague.com

*Counsel for Plaintiff and Proposed Class*